**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NFOCUS CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| BENJY UHL | ) | Judge _____ |
| 1070 Fairlan Drive | ) | |
| Lancaster, Ohio 43130 | ) | Magistrate Judge _____ |
| | ) | |
| and | ) | |
| | ) | **JURY DEMAND ENDORSED** |
| VALPAK DIRECT MARKETING | ) | **HEREON** |
| SYSTEMS, INC. | ) | |
| 805 Executive Center Drive West #100 | ) | |
| St. Petersburg, FL 33702 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## VERIFIED COMPLAINT

Plaintiff NFOCUS Consulting, Inc. ("NFocus"), for its Complaint against Defendants Benjy Uhl ("Mr. Uhl") and Valpak Direct Marketing Systems, Inc. ("Valpak") (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1.     Mr. Uhl, NFocus' former high level executive, and his current employer, Valpak, utilized NFocus' misappropriated trade secrets and engaged in underhanded unfair competition practices in a campaign to compete directly against NFocus, despite a contractual restriction that prohibits Valpak from competing against NFocus.  As a result of Defendants' wrongful conduct, they successfully solicited a large number of NFocus' then-current and prospective clients, and continue to do so at present.  Defendants' ability to solicit these clients would not have been

1

possible but for their use of trade secrets and proprietary information misappropriated from NFocus.

## THE PARTIES AND JURISDICTION

2. Plaintiff NFocus is an Ohio corporation with its principal place of business in Lancaster, Ohio, where it employs 41 associates. NFocus was founded in 1989 as a software and consulting firm. By 1993, NFocus began focusing its business on direct mail advertising services for clients, including data processing, which continues to this day.

3. Upon information and belief, defendant Mr. Uhl is an individual residing in Fairfield County, Ohio.

4. Upon information and belief, defendant Valpak is a Delaware corporation with its principle place of business in St. Petersburg, Florida.

5. This action arises under the United States Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*. (the "DFTA"), as well as under other causes of actions set forth below. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as there are federal questions of law related to the DFTA.

6. Additionally, 18 U.S.C. § 1836(C) specifically provides that the district courts of the United States shall have original jurisdiction over civil actions brought under the DFTA.

7. The Court further has supplemental jurisdiction over other claims asserted herein, pursuant to 28 U.S.C. § 1367.

8. Venue is proper pursuant to 28 U.S.C. §1391, as a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

*NFocus' Business and Proprietary Information*

9.     NFocus was founded as a software and consulting firm.  By 1993, NFocus began focusing its business on direct mail advertising services for clients, including data processing, which continues to this day.

10.     NFocus provides software-as-a-service platforms that allow its clients – largely direct mail advertising agencies throughout the United States – to create end products (typically targeted mailing lists) that have been dynamically searched, sorted, and filtered to their specific needs.  NFocus' proprietary data and platforms are unique products that are not offered by its competitors, and NFocus has amassed significant goodwill and reputation as a leader in the industry.

11.     NFocus' internal data processing and account management team members use NFocus' platforms to create these end products for its clients. NFocus' clients are unable to fully replicate the internal processes used by NFocus in order to create this end product.  These end products created by NFocus' platforms allow NFocus' clients to obtain tailored data for the design and management of direct mail advertising campaigns.

12.     The NFocus platforms are built around analyzing proprietary data that NFocus has obtained through numerous third-parties that house and install data at NFocus.  Very few companies have access to any of these third-party relationships giving them access to this unique and valuable data set.

13.     In addition to analyzing data for its clients, NFocus' proprietary platforms allow clients to also map, visualize and report on data regarding households, postal rate data, and other information that allows NFocus' clients to build highly targeted direct mail campaigns.  Clients

only receive access to these data sets when ordered and paid for through NFocus (the "First Tier Data"). The First Tier Data largely come from non-publicly available sources, but their true value is that the various proprietary data sets are housed in single platform – with economies of scale allowing the data to be offered at a low price based on relationships cultivated between NFocus and the First Tier Data vendors.

14. NFocus treats the First Tier Data as confidential, by keeping it on a secure server, limiting access to the database of its employees that need access to the data as part of their job responsibilities, and not making the full scope of the data available to its clients. The data available to NFocus' clients is smaller scoped than the full platform and is focused on parameters defined through NFocus' platforms and paid for by its clients.

15. While NFocus' clients are able to run queries against the First Tier Data through NFocus' platforms, its clients are not able to access the entire dataset. Instead, clients may order portions of the First Tier Data or select attributes of it.

16. Moreover, NFocus' clients are required to sign agreements that maintain ownership with NFocus of all information that may be obtained through NFocus' platforms; limit the scope of client's use of the data for specified, internal purposes; and prohibit clients from offering products or services in competition with NFocus (given that access to NFocus' platforms and First Tier Data would provide the client with an undue competitive advantage).

17. Among NFocus' various software platforms offerings are "ResQue" and "Listcounts," both of which provide NFocus' direct-mail clients access to the First Tier Data to aid in their direct mail campaigns. These software platforms were created and designed by Doug Cronin ("Mr. Cronin"), the owner of NFocus.

18.     Specifically, ResQue was created by Mr. Cronin in 1999. ResQue is a unique platform that allows NFocus' clients access to query certain non-public data from the United States Postal Service.   ResQue automates and manages saturation levels and territories for clients. Furthermore, ResQue allows users to perform searches that isolate target markets or desired attributes such as homeownership, income levels, and age for direct mail marketing.

19.     In 2005, Mr. Cronin developed, with assistance from coders he hired, Listcounts, which is a platform that allows NFocus clients to create and manage queries about certain target markets with the ability to store information for future retrieval.   The ability to retrieve this information for future use is a great benefit and value for NFocus' clients.

20.     Both ResQue and Listcounts are proprietary platforms that were designed and coded internally by NFocus and at the direction of, and using logic developed by Mr. Cronin. These platforms were created at much investment of money and time by Mr. Cronin for the benefit of NFocus.

21.     The source coding and technical aspects of ResQue and Listcounts are kept confidential and secure on an encrypted server, and NFocus strictly limits access to certain of its employees that need access to the data as part of their job responsibilities.

22.     Additionally, Mr. Cronin has been developing a new product, "Encore," allowing for smart saturation, that uniquely combines data sets, sets controls for data and provides a continuous loop for ongoing campaign management.   Essentially, Encore combines the foundational features of Listcounts and ResQue into a single, integrated platform. The Encore tool is anticipated as the possible basis for a new automated way for end users to combine desired data sets capitalizing on attributes while still managing postage costs.

23.     Mr. Uhl learned about the proprietary logic behind the smart saturation product and all of the building blocks to Encore during his employment with NFocus.  He also learned about Encore functionality and business rules during his employment with NFocus.  This knowledge is highly proprietary, and Mr. Uhl would never have had access to the internal understanding of the fundamentals of this product without his access to it in the course of his employment with NFocus. One of the platforms currently being offered by ValPak is a tool substantially similar to Encore.

*Mr. Uhl's Employment with NFocus*

24.     Mr. Uhl was hired in 1996 by NFocus as a front desk clerk to greet the front door, answer phones, and to utilize his marketing education to initiate marketing activities for a young and growing company.  At that time, Mr. Uhl worked 2 days per week while also attending college at Ohio University Lancaster.

25.     Mr. Uhl did not have prior professional experience in sales or direct-mail marketing, as he was hired by NFocus while still enrolled at college.

26.     NFocus requires its employees to agree to and acknowledge a confidentiality statement contained within its employee manual.  Specifically, Mr. Uhl signed an agreement which acknowledge his confidentiality obligation:

> I am aware that during the course of my employment confidential information will be made available to me, i.e., product designs, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is critical to the success of NFocus Consulting Inc and must not be given out or used outside of NFocus Consulting Inc's premises or with non-NFocus Consulting Inc employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

27.     In addition, the NFocus employee handbook provides that the employment of its associates, including Mr. Uhl, "assumes an obligation to maintain the confidentiality, even after

you leave our employ" and that associates are prohibited from "remov[ing] or mak[ing] copies of any NFocus Consulting Inc. records, software, reports or documents without prior management approval."

28.     Over time, Mr. Uhl became a more integral member of the sales staff, and his role gradually expanded to include management and executive level responsibilities.  Eventually, Mr. Uhl became an Executive Vice President ("EVP").

29.     As an EVP, Mr. Uhl was involved in dealing with NFocus' top accounts and contracts, which provided him access to and knowledge about various confidential and proprietary aspects of NFocus' business.

30.     As necessary for his job position at NFocus, Mr. Uhl was also provided wide-sweeping access to NFocus' sensitive and proprietary business records including super administrative access to NFocus' platforms, allowing him to edit client records, price, and job tickets.

31.     Mr. Uhl also had knowledge of client pricing, client terms, user activity and copy user queries (internal and external).  In fact, Mr. Uhl had access to every client facing and internal business system that provided access to the following: strategy, business and marketing plans, salary structure, client lists, company financial information, pricing, client and vendor contracts, costing, data models, business logic, platform features/details, future enhancement roadmap, data processing methodologies, product components ("secret sauce"), innovation, data stacks. Because of his sales role, Mr. Uhl had the second most comprehensive access to all of NFocus' internal systems, second only to Mr. Cronin.

32.     Over time, Mr. Uhl expressed dissatisfaction that he was not provided with an ownership interest in NFocus when he requested it of Mr. Cronin in 2015.  He continued to express his dissatisfaction to other NFocus employees through 2017.

33.     When it became apparent that NFocus would not extend ownership to Mr. Uhl in 2017, he began remarking to his coworkers of his intention to harm NFocus' business.

34.     Although it was unknown to NFocus at the time, Mr. Uhl began performing unusual searches within NFocus' systems – using his restricted super-user access – to obtained detailed information regarding NFocus' clients and the services provided.

35.     In addition, and unbeknownst to NFocus at the time, Mr. Uhl deleted over twenty years' worth of NFocus records, including *all* the emails on his company email account, important and sensitive files from his NFocus-issued computer, and shredding paper client files (the "Destroyed Records").

36.     The Destroyed Records were critical for NFocus to maintain operational continuity, including containing important details concerning both NFocus' client relationships and potential client relationships.

37.     Mr. Uhl's destruction of the Destroyed Records has significantly damaged NFocus' business operations, as well as its investigation into Mr. Uhl's improper access to and retrieval of NFocus' confidential and trade secret information.

38.     In late August, 2017, Mr. Uhl informed NFocus that he was resigning his position with three weeks advanced notice.

39.     Mr. Uhl's last day of employment with NFocus was on September 15, 2017.

40.     In the two weeks before Mr. Uhl's final work day with NFocus, he intentionally caused the Destroyed Records for purpose of damaging NFocus' then existing client relationships.

41.     Three days after leaving NFocus, on or about September 18, 2017, Mr. Uhl was named Vice President of Product and Business development for Valpak, a then-client of NFocus.

*Mr. Uhl's Employment with Valpak*

42.     Valpak provides printing, labeling, and other physical services for direct mail advertising.  Valpak also operates as a direct mail advertising agency, including through regional franchisees, whose clients are businesses that wish to through Valpak's direct mail marketing.

43.     Valpak is a client of NFocus, including through using the Listcounts and ResQue platforms to target and maintain direct mail campaigns.

44.     Prior to Mr. Uhl's resignation and immediate Valpak hiring, Valpak did not offer data analytics services or platforms in competition with NFocus.

45.     It later became apparent that Valpak, including through its hiring of Mr. Uhl, intended to develop and provide data analytics and platforms, for use both with its franchisees and other third-party direct mail companies.

46.     For instance, in a press release dated February 12, 2018 to its franchisees from Mr. Uhl, Valpak described that Valpak "ha[s] been developing a plan around the future of data at Valpak" and "we are committed to creating one of the most comprehensive databases available in the marketplace."

47.     During this period, and without considering Valpak as anything other than a typical client, Valpak (through Mr. Uhl) contracted to receive services from NFocus including use of the Listcount and ResQue platforms to assist Valpak and its franchisees in connection with targeting for their direct mail campaigns.

48.     The February 15, 2018 Service Agreement limited Valpak's use of data and information obtained through the ResQue and Listcounts for mailing purposes, and specifically

9

*prohibited* Valpak from competing against NFocus during the two-year term of the agreement. A redacted copy of the 2018 Service Agreement is attached as <u>Exhibit A</u>.

49.     The parties renewed the agreement for another two-year term on February 14, 2020 with corresponding limitations on use and competition. A redacted copy of the 2020 Service Agreement is attached as <u>Exhibit B</u>.

50.     In the agreements, Valpak also acknowledged that its breach of its obligations under the agreement would entitle NFocus to an injunction prohibiting Valpak's future use, possession, or disclosure of NFocus' proprietary data, without the necessity of posting a bond.

51.     Pursuant to the agreements, NFocus provided on-site training for the purpose of introducing the ResQue and Listcount platforms to Valpak employees – i.e., so Valpak's data solution specialists could use the platforms for the intended purpose of targeting the direct mail campaigns by Valpak and its franchisees.

52.     Unbeknownst to NFocus at the time, following Mr. Uhl's hiring at Valpak, Valpak computer programmers began attending NFocus' training sessions, including architectural engineers and technology specialists who would have no reason in their course of employment with Valpak to train on these platforms, except in order to gain access to the logic behind these programs so that they could convert them for Valpak's own competitive use.

53.     NFocus also later learned from the individuals conducting the training that questions from Valpak at the sessions were largely directed towards the technical aspects underpinning the Listcounts and ResQue platforms, rather than questions surrounding Valpak's anticipated use of the Platforms.

54.     Valpak and Mr. Uhl would conceal the involvement of computer programmers at the training sessions by, among other things, failing to identify them as attendees in advance of the

meeting and failing to identify their job titles or responsibilities (as was typically done for these trainings).

*NFocus Clients Begin Leaving NFocus for Valpak and Mr. Uhl, and*
*NFocus Discovers Mr. Uhl and Valpak's Unauthorized Access to its Systems*

55.     A large section of NFocus' business utilizes its proprietary platforms and First Tier Data to provide mailing lists to its direct mail clients, many of whom operate through a franchise model, with individual franchises serving different media markets.

56.     Beginning around February 2020, NFocus began receiving a significant increase in the number of clients cancelling their regular mailing list orders, with clients typically communicating that they were approached by another list provider.

57.     Several of the cancelling clients specifically identified that they were beginning to move their business from NFocus to Mr. Uhl at Valpak.

58.     One former client forwarded an email that it received from Mr. Uhl specifically soliciting the direct mail list business to Valpak and away from NFocus.

59.     Upon receiving several reports of clients leaving for Mr. Uhl and Valpak, NFocus began an investigation of the cancellations and the activities of Mr. Uhl and Valpak.

60.     Through this investigation, NFocus determined that Mr. Uhl and other Valpak employees were running queries on the platforms that were unrelated to the direct mail campaigns by Valpak and its franchisees (the "Unauthorized Queries").

61.     Little to no revenue generating activity appears to be performed on the platform by Valpak employees.  They were not using the platform in a manner that supports its franchisees monthly mailings (i.e., the intended use of the platforms).

62.     Through analyzing Mr. Uhl's activities on Listcounts and ResQue, it became apparent that his usage on the system was not as intended.  Instead, Mr. Uhl used his detailed

knowledge of NFocus' systems, clients, pricing, and other information to obtain and manipulate data about NFocus' clients, which empowered Mr. Uhl and Valpak to provide competing services to those clients.

63.     Mr. Uhl's ability to use and manipulate the Listcounts and ResQue platforms was only possible based on the internal, proprietary information that he learned through the course of his employment with NFocus, and NFocus' other clients would not be able to engage in such misuse of the platforms.

64.     Mr. Uhl's internal knowledge of NFocus' proprietary information combined with his integral knowledge of NFocus' platform is particularly damaging in terms of NFocus' clientele because Mr. Uhl is able to speak with clients as if he is still working at NFocus, due to the internal knowledge he obtained while employed by NFocus.  Mr. Uhl is also able to replicate the search results produced by NFocus and improve the product he sells for ValPak while using NFocus' technology to do so.

65.     Notably, there is a strong correlation between the markets contained in the Unauthorized Queries (downloaded by Valpak under the guise of internal list development) to the markets affected by the cancellations.  In other words, Mr. Uhl and Valpak were manipulating the ResQue and Listcounts platforms to create a mailing list that would otherwise have been sold by NFocus, but instead taking that list and re-selling it as if it were Valpak's.

66.     In addition, the timing of Mr. Uhl and other Valpak employees downloading the Unauthorized Queries are correlated to the timing of the departure of NFocus' customers.  For example, an established client in the Atlanta, Georgia market notified NFocus on August 30, 2020 that it would no longer purchase mailing lists from NFocus.  Thereafter, Mr. Uhl and Valpak

accessed NFocus' platforms between September 5 and 27, 2020 to run queries that are wholly consistent with developing mailing lists in Atlanta, Georgia for that client.

67.     The misappropriated information obtained through the Unauthorized Queries would necessarily have provided Mr. Uhl and Valpak with all the information to develop a mailing list for the former NFocus clients (along with mapping NFocus' pricing model), such that Valpak could provide substantially similar services while undercutting NFocus' price.

68.     In addition to targeting NFocus' then-current clients, the trade secret information misappropriated by Mr. Uhl and Valpak (through the Pre-Resignation Queries, Unauthorized Queries, or otherwise), provides Valpak with the ability to sell mailing lists and other ill-gotten services to countless other clients that NFocus has no ability to fully identify.

69.     As a result of these actions, NFocus has lost numerous current clients, as well as additional revenue from other prospective clients or third-parties that have obtained services from Valpak in an amount that cannot be measured at this time.

*Valpak Uses NFocus' Proprietary Information*
*to Develop a Competing Platform*

70.     NFocus understands that Valpak has created a platform with substantially similar functions of NFocus' ResQue, Listcount, and forthcoming Encore platforms.

71.     Specifically, one of NFocus' clients communicated to NFocus that Valpak demonstrated for him a platform and described the features of the platform.  Those features substantially resembled those of Encore.

72.     Information obtained by Valpak's computer programmers through the "training" sessions on the NFocus ResQue and Listcount platforms (including the myriad of technical questions and understanding sought during those trainings) would necessarily have facilitated the development of the competing platform.

13

73. Valpak's development of such a platform, through trade secrets misappropriated and obtained through deception, will allow Valpak the ability to develop and sell its own mailing lists (i.e., without the continued need to use NFocus' platforms to obtain this information).

74. Valpak will be further able to solicit NFocus' current and prospective clients, and otherwise compete directly against NFocus based on its new platform, which was wrongfully derived from NFocus' proprietary ResQue, Listcount, and Encore platforms.

## FIRST CAUSE OF ACTION
Trade Secret Misappropriation - United States Defend
Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.
(*Against all Defendants*)

75. NFocus hereby incorporates by reference all prior allegations as though fully set forth herein.

76. NFocus owned and possessed certain confidential, proprietary, and trade secret information as set forth above, including First Tier Data, information identifying its clients and pricing, business and sales strategies, and system/architecture information related to its ResQue, Listcounts, and Encore platforms.

77. This confidential, proprietary, and trade secret information relates to products and services that are used in, or intended for use in, interstate commerce, as NFocus sells mailing lists and related services to direct mail advertisers throughout the United States.

78. NFocus has taken reasonable measures to keep such information secret and confidential, including storing the information on encrypted servers, restricting access only to certain employees, requiring employees to sign confidentiality agreements, and protecting the information through restrictive license agreements with its clients that may access certain aspects of the data.

79. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

80. In violation of NFocus' rights, Defendants wrongfully retained and used the confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein.

81. Specifically, Mr. Uhl misappropriated the confidential, proprietary, and confidential information, as he used it outside the scope of his employment with NFocus, in directed competition with NFocus, and in breach of the restrictions for the use of the data pursuant to the Service Agreements between Valpak and NFocus.

82. Valpak misappropriated NFocus' confidential, proprietary, and confidential information through (i) the aforementioned actions of its employee, Mr. Uhl, and (ii) the acts of its other employees that improperly accessed data, including the Unauthorized Queries, in breach of the Service Agreements between Valpak and NFocus.

83. Valpak benefitted through the misappropriation by Mr. Uhl and other Valpak employees, who acted on Valpak's behalf.

84. Defendants' misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, malicious, fraudulent, and oppressive.

85. Mr. Uhl attempted to conceal his misappropriation of NFocus' confidential, proprietary, and trade secret information by, among other things, causing the destruction of the Destroyed Records.

86. Defendants further attempted to conceal their misappropriation by, among other things, attempting to hide the involvement of computer programmers during NFocus' sales trainings.

87. If Defendants' conduct is not remedied and enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to NFocus' detriment, NFocus' confidential, proprietary, and trade secret information.

88. As a direct and proximate result of Defendants' conduct, NFocus has suffered and, if Defendants' conduct is not enjoined, will continue to suffer imminent and irreparable injury.

89. NFocus has not adequate remedy at law. Unless enjoined by this Court, Defendants' acts of misappropriation will continue and NFocus will continue to suffer irreparable harm.

90. Defendants' prior acts of trade secret misappropriation have caused NFocus monetary damages in an amount not fully ascertainable at this time, representing lost revenue attributable to Defendants' unlawful conduct.

## SECOND CAUSE OF ACTION
Trade Secret Misappropriation – O.R.C. 1333.61, *et seq*.
(Against all Defendants)

91. NFocus hereby incorporates by reference all prior allegations as though fully set forth herein.

92. NFocus owned and possessed certain confidential, proprietary, and trade secret information as set forth above, including First Tier Data, information identifying its clients and pricing, business and sales strategies, and system/architecture information related to its ResQue, Listcounts, and Encore platforms.

16

93.     Upon information and belief, Mr. Uhl and Valpak (through Mr. Uhl other of its employees) have used, and are using, NFocus' confidential, proprietary, and trade secret information to offer similar services to those offered by NFocus, and to undercut NFocus on pricing, such that ValPak has caused NFocus' past, present, and potential clients to retain ValPak for those services.

94.     NFocus' confidential, proprietary, and trade secret information is neither publicly disseminated nor a matter of general public knowledge, and therefore retains independent economic value.

95.     NFocus takes reasonable precautions to prevent its confidential, proprietary, and trade secret information from being made available to the public, including only storing its information on secured services and facilities, only allowing electronic access to the information through its password-protected computer network, and limiting its employees' (including Mr. Uhl's) use of the information through contractual confidentiality restrictions.

96.     NFocus' confidential, proprietary, and trade secret information qualifies as trade secrets under O.R.C. § 1333.61.

97.     Mr. Uhl exceeded the scope of his use of the confidential, proprietary, and trade secret information, as he used it outside the scope of his employment with NFocus, and in directed competition with NFocus.

98.     Valpak misappropriated NFocus' confidential, proprietary, and trade secret information through the aforementioned actions of its employee, Mr. Uhl and benefitted through Mr. Uhl's misappropriation on Valpak's behalf.

99.     Defendants' misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, malicious, fraudulent, and oppressive.

17

100.    Mr. Uhl attempted to conceal his misappropriation of NFocus' confidential, proprietary, and trade secret information by, among other things, causing the destruction of the Destroyed Records.

101.    Defendants further attempted to conceal their misappropriation by, among other things, attempting to hide the involvement of computer programmers during NFocus' sales trainings.

102.    If Defendants' conduct is not remedied and Defendants' conduct is not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to NFocus' detriment, NFocus' confidential, proprietary, and trade secret information.

103.    As a direct and proximate result of Defendants' conduct, NFocus has suffered and, if Defendants' conduct is not enjoined, will continue to suffer imminent and irreparable injury.

104.    NFocus has not adequate remedy at law.    Unless enjoined by this Court, Defendants' acts of misappropriation will continue and NFocus will continue to suffer irreparable harm.

105.    Defendants' prior acts of trade secret misappropriation have caused NFocus monetary damages in an amount not fully ascertainable at this time, representing lost revenue attributable to Defendants' unlawful conduct.

### THIRD CAUSE OF ACTION
Breach of Contract
(Against Valpak)

106.    NFocus hereby incorporates by reference all prior allegations as though fully set forth herein.

107.    NFocus and Valpak entered into valid and enforceable agreements through their signatures on the 2018 and 2020 Service Agreements.

108.    As set forth above, the Service Agreements, among other things, limit Valpak's use of data obtained from NFocus in the course of their relationship and prohibits Valpak from competing against NFocus.

109.    NFocus substantially performed its obligations pursuant to the Service Agreements.

110.    Valpak materially breached the Service Agreements by, among other things, (i) using the Unauthorized Queries for a purpose outside the scope of the Service Agreements (i.e., to sell lists to NFocus' then-clients and others), and (ii) compete against NFocus by selling mailing lists and developing a competing platform wrongfully derived from Listcounts and ResQue.

111.    Valpak's breach of the Service Agreements is ongoing, as it continues to solicit NFocus' clients and use the wrongfully obtained competing platform.

112.    NFocus is entitled to monetary damages for Valpak's past breaches of the Service Agreements and injunctive relief to enjoin further breaches.

## FOURTH CAUSE OF ACTION
Tortious Interference
(Against all Defendants)

113.    NFocus hereby incorporates by reference all prior allegations as though fully set forth herein.

114.    NFocus had active or prospective business relationships with numerous companies, the names of whom are not disclosed herein to protect client confidences.]

115.    Defendants knew about NFocus' active or prospective business relationships and, by acts and omissions described herein, intentionally interfered with them without reasonable justification or privilege to do so.

116.    Due to Defendants' intentional interference, many of NFocus' active and/or prospective business relations were terminated.

117. The acts and conduct of Defendants were calculated and premeditated, intentional, malicious, willful, and were undertaken for with reckless disregard of the probably adverse consequences to NFocus.

118. If Defendants' conduct is not remedied and enjoined, Defendants will continue to tortuously interfere with NFocus' active and/or prospective business relations and have caused, and will continue to cause NFocus to suffer imminent and irreparable injury.

119. NFocus has not adequate remedy at law. Unless enjoined by this Court, Defendants' tortious interference will continue and NFocus will continue to suffer irreparable harm.

120. Defendants' prior acts of tortious interference have caused NFocus monetary damages in an amount not fully ascertainable at this time, representing lost revenue attributable to Defendants' unlawful conduct.

### FIFTH CAUSE OF ACTION
Unjust Enrichment
(Against all Defendants)

121. Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

122. During his employment with NFocus, Mr. Uhl gained access and was privy to a wealth of confidential, proprietary, and trade secret information. Such access to and availability of NFocus' confidential, proprietary, and trade secret information was a benefit to Mr. Uhl of which he was aware.

123. Mr. Uhl and Valpak (through Mr. Uhl) continue to use and/or disclose NFocus' confidential, proprietary, and trade secret information for personal gain, and for the gain of Valpak, to the direct detriment of NFocus.

124. It would be unconscionable and against fundamental principles of justice, equity, and good conscience to allow Defendants to retain improperly earned profits under circumstances where it is unjust to do so without payment.

125. NFocus is entitled to restitution for the amounts in which Defendants have been unjustly enriched, including, the amount of profits earned as a result of Defendants' retention and use of NFocus' confidential, proprietary, and trade secret information.

**PRAYER FOR RELIEF**

NFocus seeks judgment against Defendants as follows:

A. That the Court issue judgment against Defendants on each of the causes of action set forth in this complaint.

B. That the Court issue a preliminary and permanent injunction against Defendants, enjoining Defendants from: (i) offering, selling, renting, soliciting or otherwise providing goods or services that compete with NFocus, including mailing lists and data analytics platforms to direct mail advertisers; (ii) using NFocus' confidential and proprietary information and systems unless otherwise authorized through the Service Agreements; and (iii) disparaging NFocus to its current and former clients.

C. The Court award NFocus compensatory damages in an amount to be proven at trial, plus any punitive or exemplary damages that may be available through law or equity.

D. The Court award NFocus its attorney fees, including pursuant to 18 U.S.C. § 1836(b)(3)(D) due to Defendants' willful and malicious misappropriation of NFocus' trade secrets.

E. The Court grant such other relief as it deems just and proper.

Respectfully submitted,

*/s/ Lisa A. Messner*
Lisa A. Messner (#0074034), Trial Attorney
Christopher C. Wager (#0084324)
MAC MURRAY & SHUSTER LLP
6525 W. Campus Oval, Suite 210
New Albany, Ohio 43054
T:      614.939.9955
F:      614.939.9954
E:      lmessner@mslawgroup.com
        cwager@mslawgroup.com

*Counsel for Plaintiff,*
*NFocus Consulting, Inc.*

## JURY TRIAL DEMAND

NFocus demands a trial by jury on all issues triable.

*/s/ Lisa A. Messner*

## **VERIFICATION**

I, Douglas Cronin, am CEO of NFocus Consulting, Inc. I declare under penalty of perjury that the factual assertions in the foregoing Verified Complaint are true and correct.

Executed on September 28, 2020

Douglas Cronin